# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1479V

| | |
|---|---|
| DONNA L. CLARK,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: September 10, 2025 |

*Steven K. Jambois, Kralovec, Jambois and Schwartz, Chicago, IL*, for Petitioner.

*Meghan Murphy, U.S. Department of Justice, Washington, DC*, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

  On October 11, 2022, Donna L. Clark filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a right shoulder injury related to vaccine administration ("SIRVA") following receipt of an influenza ("flu") vaccine on October 10, 2019. Petition (ECF No. 1). The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("the SPU"). For the reasons set forth below, I find that the at-issue vaccine was most likely administered in Petitioner's right arm, as alleged, and she is otherwise entitled to compensation for a Table SIRVA. I also award $60,000.00 for past pain and suffering.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I. Procedural History

In July 2023, the case was assigned to the SPU (an adjudicatory system for expedited resolution of certain Vaccine Act claims). ECF No. 21. Respondent formally opposed compensation, initially arguing that the claim was untimely. Combined Rule 4(c) Report and Motion to Dismiss filed May 6, 2024 (ECF No. 29); *but see* Order entered Aug. 19, 2024 (ECF No. 30) (denying the motion to dismiss because the petition had been timely filed immediately after a legal holiday).

Respondent then argued that the at-issue vaccine had been administered in Petitioner's non-injured left arm, according to vaccine administration records (Ex. 9, obtained by subpoena after the petition's filing) – which would confound a right-sided SIRVA allegation. Amended Rule 4(c) Report filed Sept. 18, 2024 (ECF No. 31). The parties have now briefed entitlement for a right SIRVA Table injury, and in the event that Petitioner so prevails, the appropriate award of damages for such an injury. Petitioner's Brief filed Dec. 6, 2024 (ECF No. 35); Respondent's Response filed Feb. 21, 2025 (ECF No. 39).[3] The matter is ripe for adjudication.

### II. Evidence[4]

#### A. Medical Records

At the relevant time, Petitioner was nearly 58 years old and held a job working with nursing home patients. Ex. 2 at 32; Ex. 7 at 23. She had no history of shoulder pain or dysfunction. *See generally* Ex. 7; Ex. 11 at 215-28.[5]

Petitioner received the at-issue flu vaccine on October 10, 2019, at a CVS pharmacy. The vaccine consent and administration record contains signatures from Petitioner and the immunizing pharmacist, as well as pre-printed information about the

---

[3] Petitioner did not take her opportunity to file a Reply. It is also noted that I considered the case for resolution via an expedited hearing at a "Motions Day," and the parties confirmed that the only issues in dispute were entitlement and past pain and suffering. But due to the parties' scheduling conflicts for Motions Days planned for August and September 2025, *see* ECF Nos. 41 and 44, the case is hereby decided on the written record.

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

[5] When addressing Petitioner's care at the Springfield Clinic, this opinion cites to the certified and updated records contained in Ex. 11 filed Feb. 7, 2024 (ECF No. 27-1), in contrast to the parties, who cited to earlier exhibits containing many of the same records.

vaccine including a site of "Left Deltoid." Ex. 9 at 14, 16;[6] *accord id.* at 2 (electronic list of vaccines provided at CVS).

Thirteen (13) days later, on October 23, 2019, Petitioner was seen at the Springfield Clinic, for management of anemia – but her only complaint was "some shoulder discomfort after receiving influenza vaccine." Ex. 11 at 212. No corresponding shoulder exam, assessment, or treatment was provided. *Id.* at 213-14.[7]

Five days later on October 28, 2019, Petitioner returned to the Springfield Clinic, reporting receipt of a flu shot "through CVS… within the right shoulder," followed "right after" by right shoulder pain, which had "progressively gotten more achy," and persisted for 18 days. Ex. 11 at 208. She reported pain with movement and difficulty sleeping, but she reportedly could not take over-the-counter pain relief medication. *Id.* A physical examination of the shoulder, focusing on range of motion ("ROM"), found "very limited abduction" and active extension to 90 degrees. *Id.* at 209. A physician's assistant ("PA") did not render a specific assessment, prescribed a tapering dose of prednisone, ordered an x-ray (which was unremarkable), and referred Petitioner for an orthopedic consult. *Id.* at 208, 211.

At the October 30, 2019 orthopedics initial evaluation, Petitioner again reported an injury from "having a flu shot in the right shoulder." Ex. 11 at 204. Her pain ranged from 3-8/10, mostly with shoulder abduction and forward flexion, and "occasionally" kept her up at night. *Id.* The pain was "tremendously" helped by prednisone, however. *Id.* An exam confirmed decreased ROM (specifically a 25-degree deficit in forward flexion, and 35-degree deficit in abduction) and positive Neer's and Hawkins tests. *Id.* at 205. The orthopedist assessed "right shoulder pain, likely rotator cuff inflammation; could be related to a local reaction to her vaccine injection." *Id.* Petitioner was told to finish out the course of steroids and try performing home exercises. *Id.*

At a November 30, 2019 follow-up, the orthopedist recorded that Petitioner had completed her steroid course and her right shoulder pain had returned to "the normal 6/10." Ex. 11 at 196. She could not take oral NSAIDs due to reflux. *Id.* Another exam was largely normal with "full range of motion without pain actively," but slightly decreased strength (4+/5 external rotation), a 30-degree deficit in internal rotation compared to the

---

[6] CVS supplied two copies of the flu vaccine consent and administration record, with differing redactions made to each. When viewed together, the two copies are fully legible, however. At a December 6, 2023 initial status conference, Petitioner stated that she did not apply the redactions, CVS likely did. ECF No. 24.

[7] Neither party cited this record. *See* Amended Rule 4(c) Report at 2; Brief at 1; Response at 2.

3

left side, and positive Hawkins and Neer's signs. *Id.* The orthopedist prescribed Celebrex and ordered an MRI and formal physical therapy ("PT").

The December 6, 2019 MRI results suggested the presence of supraspinatus and infraspinatus tendinopathy with edema and fluid, but no tearing, and mild acromioclavicular joint arthritis. Ex. 2 at 16. Five days later, the orthopedist recorded that Petitioner's pain "had not improved at all," but she deferred a steroid injection because she was "leery" and "not a big fan of needles." Ex. 11 at 193-94. She was urged to start PT to "not get stiff"; the injury would likely "get better in time but… take many months to resolve." *Id.* at 194.

At the December 17, 2019 PT initial evaluation, Petitioner's reported onset was October 10, 2019, when she "had her flu shot in the right arm… up too high in the arm." Ex. 3 at 2. Her pain ranged from 1-9/10, increasing with movement. *Id.* at 3. An exam found decreased active and passive ROM, normal strength except for 4+/5 on external rotation, tenderness on palpation, and positive Neer's and Hawkins tests. *Id.* The therapist planned formal and home therapies to treat subacromial bursitis. Ex. 3 at 4; *see also id.* at 5-10 (three subsequent PT sessions).

At a January 8, 2020 orthopedics follow-up, Petitioner reported "feeling worse" despite starting PT. Ex. 11 at 186. The orthopedist felt that she had recently developed adhesive capsulitis, in addition to the previously-visualized rotator cuff tenosynovitis. *Id.* at 187. Petitioner consented to receiving a subacromial steroid injection that day. *Id.*; *see also* Ex. 3 at 11-23 (PT sessions 5-10, reflecting temporary pain relief).

On February 3, 2020, an orthopedics physician's assistant ("PA") recorded that Petitioner felt "20% better"; her pain currently rated 2/10, but was exacerbated with certain movements and directions. Ex. 11 at 183. The PA told Petitioner to continue PT with ROM and strengthening exercises for her diagnosed adhesive capsulitis, and to follow up in eight weeks for a repeat steroid injection. *Id.*

Petitioner attended two more PT sessions on February 5 and 10, 2020. Ex. 3 at 24-26. At the 12th and final session (labeled a re-evaluation), Petitioner reported pain ranging from 1-4/10, associated with reaching her arm up, out, and back. *Id.* She was frustrated with her lack of progress – stating: "I will keep doing exercises, but I want to see over the next few weeks if I can handle the exercises myself. They [the orthopedics providers] said this could take 9 months, and I can't keep coming to PT that long." *Id.* at 25. She was using heat to manage the pain, which was "tolerable" and ranging from 1-4/10. *Id.* The therapist recorded ongoing pain, ROM deficits, and weakness, but approved Petitioner's release to an independent home exercise program. *Id.*

4

A May 27, 2020 orthopedics follow up record provides: "Petitioner did quite a bit of [PT], which has been beneficial, but she has basically been in a holding pattern doing home exercises for the past few months and has not noticed any significant improvements… At this point she denies really having any significant pain. It is just the lack of motion and she feels weakness. She has increased pain if she lays on the shoulder, and she cannot tolerate any sort of repetitive activity like vacuuming, sweeping etc." Ex. 11 at 179. An exam found decreased internal rotation (Petitioner could not reach behind her back), 4+/5 strength and pain on abduction, and negative impingement testing. *Id.* She was sent to a shoulder specialist to help guide further treatment. *Id.* at 180.

The shoulder specialist's record from June 2, 2020, repeats the same history of a right-sided vaccination and resulting injury. Ex. 11 at 171. His exam found 4+/5 strength at the supraspinatus and infraspinatus, positive impingement signs, and decreased passive forward flexion. *Id.* at 171-72. After reviewing the imaging, the shoulder specialist assessed "subacromial bursitis/ impingement status post-flu shot," which would "most likely resolve over time". *Id.* at 172. Petitioner deferred an intra-articular steroid injection on that date, instead agreeing to consider that option and follow up if she had ongoing symptoms. *Id.*

In a July 14, 2020 letter "to whom it may concern", the original orthopedist endorsed that Petitioner had developed "inflammation within the shoulder from vaccine placement of the shoulder joint" with no apparent alternative explanation. Ex. 4 at 2. The orthopedist recounted Petitioner's initial treatment course and "very slow progress", but not her current prognosis. *Id.* Indeed in a September 23, 2020 appointment record, the orthopedist reviewed that her right shoulder injury from the flu vaccine "eventually… did resolve," upon evaluating a new complaint regarding her *left* shoulder. Ex. 11 at 143. The remaining medical records are focused on unrelated complaints including low back pain assessed as lumbar radiculopathy. Ex. 11 at 1-178.

### B. Additional Evidence

In an October 2021 affidavit, Petitioner describes the onset of right shoulder pain on the date of vaccination, without specifically addressing situs. Ex. 8. In a December 2024 supplemental affidavit, Petitioner avers that the original CVS record incorrectly suggests a left-sided administration for the flu vaccine. Ex. 12 at ¶ 2. Petitioner states that after discovering this "discrepancy," in August 2023 she returned to CVS and spoke with the administering pharmacist, who agreed to make a handwritten notation on a copy of the record. *Id.* at ¶ 8; *see also* Ex. 10 (reading "Right Deltoid. LC 8/22/23"). Finally, I have reviewed the signed statements of Petitioner's husband and sister, who recount observing

5

her right shoulder with a bandage, redness, and swelling, within one day after the at-issue vaccination. Exs. 13-14.[8]

### III. Factual Findings and Ruling on Entitlement

#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[9] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

---

[8] Petitioner completed two affidavits with notarization (Exs. 8, 12). In contrast, while her husband and sister's statements are labeled as affidavits, they are not notarized – or signed under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

[9] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

6

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

7

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Finding of Fact - Situs

The only disputed issue is the site of vaccine administration. Respondent contends that there is not preponderant evidence in Petitioner's favor, because the most contemporaneous record indicates the left deltoid. Amended Rule 4(c) Report at 4-5; Response at 6-7. Respondent argues that Vaccine Act Section 13(a)(1) prevents me from finding in Petitioner's favor based on her claims alone. *Id.*

My experience resolving SIRVA cases has taught me that it is not unusual for information regarding the vaccine administration site to be incorrect – especially information contained in *computerized* records, which may feature a 'dropdown' menu which may not be updated each time a separate vaccine is administered.[10] Thus, although such records are unquestionably the first-generated documents bearing on issues pertaining to situs, they are not per se reliable simply *because* they come first – and in fact the nature of their creation provides some basis for not accepting them at face value.[11] This case involves just such computerized, pre-printed information.[12]

In contrast to CVS's records, all other medical records in the case support Petitioner's situs contentions. It is particularly notable that these medical records begin just 13 days post-vaccination. Several records explicitly describe a right-sided vaccine administration, in the context of evaluation and treatment of Petitioner's right shoulder injury. *See, e.g.*, Ex. 11 at 212; 208, 204 (organized chronologically); Ex. 3 at 2. The

---

[10] *See, e.g.*, *Mezzacapo v. Sec'y of Health Servs.*, No. 18-1977, 2021 WL 1940435, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 2021); *Desai v. Sec'y of Health & Human Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Human Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Human Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

[11] In contrast, information which requires *specific action* on the part of the vaccine administrator (often at the very time of administration), such as a handwritten notation on a printed form, generally warrants more significant weight *See, e.g.*, *Schmidt v. Sec'y of Health & Hum. Servs.*, No. 17-1530V, 2021 WL 5226494, at *8 (Fed. Cl. Spec. Mstr. Oct. 7, 2021); *Marion v. Sec'y of Health & Hum. Servs.*, No. 19-0495V, 2020 WL 7054414 at *8 (Fed. Cl. Spec. Mstr. Oct. 27, 2020).

[12] I have considered that alongside the preprinted notation of "Left Deltoid," both Petitioner and the administering pharmacist signed the record – but Petitioner has attested that she only realized the record was incorrect upon review several years later, *see* Ex. 12, and Respondent has not argued this point. Moreover, the weight of the evidence supports Petitioner's allegation of a right-sided vaccination.

Federal Circuit has counseled that patient histories "in general, warrant consideration as trustworthy evidence… [as they] contain information supplied to… health professionals to facilitate diagnosis and treatment." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

I rely very little - if at all – on Petitioner and the pharmacist's annotation of the vaccine record nearly four years after the fact (Ex. 10) or moreover, on the unsworn statements from Petitioner's husband and sister (Exs. 13-14). Instead, the medical record evidence alone preponderates in favor of a right-sided vaccine administration.

### C. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's success in meeting the remaining QAI requirements is not disputed,[13] and I also find that they have been preponderantly satisfied. The record does not suggest that Petitioner had a history of shoulder pain or any other condition that would explain her post-vaccination symptoms. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. *See, e.g.*, Ex. 11 at 171-72, 179-80.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 9. She experienced residual effects of the injury for more than six months. *See, e.g.*, Ex. 11 at 171-72, 179-80. And she states that she has never received an award or settlement of a civil action for the injury, nor has she filed a civil action. Ex. 8 at ¶ 6. Thus, Petitioner is entitled to compensation.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

### A. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related

---

[13] Respondent does not raise any arguments concerning the remaining SIRVA Table QAI requirements or statutory requirements. *See generally* Amended Rule 4(c) Report; Response.

injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[14]

### B. Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole, including the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the evidence supports that Petitioner's right SIRVA was somewhat mild overall and also limited in duration. As detailed further above, Petitioner reported the injury promptly – first during an unrelated appointment just thirteen days post-vaccination, which was followed by a primary care evaluation specifically of the shoulder five days later. She received consistent but fairly conservative treatment (specifically primary care and orthopedic evaluations, imaging, one course of oral steroids, prescription Celebrex, one steroid injection, 12 formal PT sessions, and home exercises). That treatment course ended just short of eight months post-vaccination, and her orthopedist expressly stated that the right shoulder injury had "resolve[d]" 11.5 months post-vaccination, Ex. 11 at 143.

I recognize that Petitioner reported pain of up to 8-9/10 in the first few months, and that she could not take over-the-counter pain relief medications due to reflux concerns. Ex. 11 at 204; Ex. 3 at 3. But she also characterized the pain as fluctuating and associated with certain movements; she received temporary relief from a steroid injection; and in later months her pain was no longer "significant" – dropping down to the lower end of a ten-point scale. *See, e.g.*, Ex. 11 at 183, 179; Ex. 3 at 25. It also seems that Petitioner

---

[14] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

continued to physically assist nursing home patients throughout her injury, *see e.g.*, Ex. 3 at 3. And she has not established any formal accommodations or leave of absence from that employment.

Petitioner contends that her past pain and suffering warrants an award of $90,000. Brief at 9. She agrees that she should receive less than other individuals who underwent surgical intervention for their SIRVAs, such as in *Yodowitz*. *Id.*[15]

But Petitioner has not adequately explained why her case is "in line with" – let alone *more severe* – than *Russano* (awarding $80,000.00), which in this Petitioner's summarization involved "23 physical therapy appointments, x-rays, an MRI, and one injection." Brief at 9-10.[16] Indeed, Respondent correctly observes that Ms. Clark attended half the number of PT sessions, and that her SIRVA did not cause compensatory injuries akin to the *Russano* petitioner's history of breast cancer which affected use of the injured arm and chondrodermatitis nodularis necessitating multiple injections to the right ear. Response at 11; *Russano*, 2020 WL 3639804, at *3-4.

Petitioner also states that in *Sherbine*, $70,000.00 was awarded to a petitioner who "only had 4 physical therapy sessions, one x-ray, one injection, and one orthopedic appointment." Brief at 9.[17] Petitioner argues that her additional treatment (e.g., additional orthopedic follow-up appointments and more PT sessions) justifies a higher award. *Id.* I also note that the *Sherbine* petitioner's active treatment course was roughly eight months - about the same duration as in this case. 2020 WL 1933136 at *10-11. But Respondent notes that the *Sherbine* petitioner's limited PT course was explained by financial limitations, and her high pain levels continued throughout the treatment course – compared to Ms. Clark here, whose pain seemed to decrease over time. *See* Response at 11-12; *Sherbine*, 2020 WL 1933136 at *10-11. Thus, Petitioner has not established pain and suffering *more severe* than that in *Sherbine*.

At the same time, Respondent's valuation of $52,500.00 is too low. *See* Response at 12-13. I recognize that Respondent's only cited case, *Norton*,[18] featured a facially

---

[15] Citing *Yodowitz v. Sec'y of Health & Hum. Servs.*, No. 21-370V, 2024 WL 4284926 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (awarding $100,000.00 for past pain and suffering);

[16] *Russano v. Sec'y of Health & Hum. Servs.*, No. 18-392V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020) ($80,000.00).

[17] *Sherbine v. Sec'y of Health & Hum. Servs.*, No. 17-413V, 2020 WL 1933136 (Fed. Cl. Spec. Mstr. Mar. 27, 2020) ($70,000.00).

[18] Citing *Norton v. Sec'y of Health & Hum. Servs.*, No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) ($55,000.00).

11

similar treatment duration and course, but a greater number of PT sessions (24, compared to 12 for Ms. Clark). But the *Norton* petitioner obtained "significant relief" from her steroid injection three months post-vaccination, followed by consistent denials of pain and findings of normal ROM, and a conclusion that she had met all PT goals. 2021 WL 4805231. In contrast, Ms. Clark's injury decreased somewhat over time, but was nonetheless more resistant to the steroid injection and PT, and was not assessed as "resolve[d] until nearly the one-year mark (despite the earlier discontinuation of formal treatment).

Based on consideration of the record evidence, the above comparisons, and my overall experience with SIRVAs, I find that a fair and appropriate award for past pain and suffering in this case is **$60,000.00.**

## Conclusion

As explained above, **I conclude that Petitioner has established a right-sided vaccination and all other entitlement requirements for a Table SIRVA. Thus, Petitioner is entitled to compensation in this case.**

**I also award Petitioner a lump sum payment of $60,000.00 (for past pain and suffering[19]) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[20]

**IT IS SO ORDERED.**

                                                                              s/Brian H. Corcoran
                                                                              Brian H. Corcoran
                                                                              **Chief Special Master**

---

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.